ace

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MICHAEL HOWARD,                      )
                                     )
                 **Plaintiff,**       )
                                     )
v.                                   )     **Case No. 04-2601-JAR**
                                     )
MILLARD REFRIGERATED                 )
SERVICES, INC.,                      )
                                     )
                 **Defendant.**       )
_____)

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter comes before the Court on defendant's Motion for Partial Summary
Judgment (Doc. 56). In this motion, defendant seeks summary judgment on plaintiff's retaliation
and interference claims under the Family Medical Leave Act[1] ("FMLA") and plaintiff's
whistleblower claim under Kansas state law.[2] The matter is fully briefed, and the Court is now
prepared to rule. For the reasons set forth below, the Court grants defendant's motion for partial
summary judgment.

## I.     Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most
favorable to plaintiff. Defendant Millard Refrigerated Services, Inc. is engaged in the business
of providing temperature-controlled warehouse and distribution facilities, and it maintains a cold
storage warehouse facility in Edwardsville, Kansas. Defendant's Senior Executive Staff, which

---

[1] 29 U.S.C. §§ 2601–2654.

[2] Plaintiff has also brought claims for hostile work environment, racial discrimination, and retaliation, but
defendants have not moved for judgment on these claims.

is comprised of the senior executives in the company, is located in Omaha, Nebraska.  The

Senior Executive Staff reviews and approves of personnel and termination decisions for all of

defendant's employees with over two years experience.

Plaintiff Michael Howard, an African-American male, began working for defendant in its

Edwardsville facility on June 21, 1998.  At all times relevant to this action, Brandon Bolton was

the General Manager for the Edwardsville facility.  Plaintiff was initially employed in an hourly

position as an Order Selector.  After receiving several promotions, plaintiff was employed in a

salaried position as Lead Supervisor.  Bolton made the decision to promote plaintiff to Lead

Supervisor, which was a newly created position at that time.

In June 2003, plaintiff started having headaches, experienced dizziness, and was not

sleeping well.  Plaintiff's regular doctor tested his blood pressure, which was fairly high, and

conducted other tests.  Eventually, plaintiff's doctor suggested that he visit a mental health

professional.  Plaintiff met with a psychiatrist who urged him to commit himself to a mental

health facility.

On or about August 27, 2003, plaintiff started receiving treatment at a mental health

facility, and he stayed there approximately two weeks.  On or about that same day, plaintiff took

to defendant a note from his psychiatrist that stated that plaintiff would need leave from work for

a number of days.  Plaintiff left the note with defendant at about 5:00 p.m.  Plaintiff also left

voicemails with Lisa Livingston, an employee in the human resources department, and Dave

Cosgrove, plaintiff's supervisor, requesting FMLA forms.  On August 29, 2003, plaintiff arrived

at defendant's facility to pick up his FMLA paperwork that he expected would be in his "in

box."  Plaintiff maintains that Livingston told him that he would need to come into the facility

and talk to Bolton before plaintiff could obtain FMLA paperwork.

After plaintiff dropped off his doctor's note, plaintiff received a number of phone calls from defendant regarding his leave.  Plaintiff asked Cosgrove to stop calling his house because plaintiff had not told his wife about the situation, and he asked Cosgrove not to talk to anybody about his medical condition.  Cosgrove stopped calling plaintiff's house, but plaintiff started receiving calls from defendant on his cell phone.  Plaintiff spoke with Cosgrove just that one time, but messages were left when he received the other calls.

The following week, on either September 1 or September 2, 2003, plaintiff met with Bolton to pick up his FMLA paperwork.  Plaintiff told Bolton that he had already provided a doctor's note to defendant, and Bolton expressed doubt as to the legitimacy of the note, stating that anyone could fake a doctor's note.  Bolton told plaintiff that he would have to show plaintiff how to fill out the forms, and Bolton started going over the paperwork with plaintiff.  Then Bolton asked plaintiff if plaintiff's wife knew about his medical situation.  Plaintiff took the paperwork, and walked out of Bolton's office.  Plaintiff testified that he left the office because Bolton's question was not any of his business.

On September 2, 2003, defendant sent plaintiff a letter requesting certification of his medical condition from his doctor by 5:00 p.m. on Friday, September 5, 2003, otherwise plaintiff would face termination.  Plaintiff obtained the appropriate paperwork from his doctor in compliance with defendant's deadline; he faxed a second doctor's note and certification of his health condition to defendant on September 5, 2003.  Plaintiff maintains, however, that he was forced to miss mental health treatment in order to gather the appropriate paperwork before defendant's deadline.

On September 8, 2003, defendant was granted FMLA leave retroactively to August 27, 2003.  Plaintiff testified that no one ever told him that he could not take FMLA leave.  Plaintiff also testified that he had "no issue" with defendant's requests for verification of his medical condition for which he was seeking FMLA leave.  Plaintiff was paid full salary while on FMLA leave, but he was required by defendant to use all accrued vacation, personal holiday, and sick leave during his FMLA absence.

Defendant's employee handbook includes a leave of absence policy that states:

> [u]nder no circumstance should you be granted a leave of absence to accept other employment.  If while on leave of absence, you accept other employment, such acceptance will result in automatic termination.

Defendant's employee handbook also prohibits dual employment.  The handbook states, "Company executives and supervisory/salaried jobs are full-time jobs, as such regular employment with any other organization is prohibited."  With regard to FMLA leave, defendant's handbook and policy are silent as to whether accepting other employment is prohibited.  Plaintiff received and signed for defendant's employee handbook.

On or about September 19, 2003, Bolton was told by a coworker that plaintiff was working at Black's Liquor Store.  Bolton personally visited Black's Liquor Store, and he saw plaintiff in the back room of the liquor store moving some boxes.  Bolton said "hi" to plaintiff, made a purchase, and then left the store.  Bolton testified that he went to the liquor store at about 3:30 p.m., which would have been during plaintiff's normal working hours with defendant.  But plaintiff contends that Bolton saw him at the liquor store at approximately 6:30 p.m., which was not during plaintiff's normal working hours of 5:00 a.m. to 6:00 p.m.

After Bolton saw plaintiff at the liquor store, he called the corporate human resources

4

department, located in Omaha.[3]  Bolton spoke to Mark Stinson and informed him that he had

seen plaintiff working at Black's Liquor Store while plaintiff was on FMLA leave.  Bolton later

received a call from John Sullivan, the Senior Vice President of Human Resources and a member

of the Senior Executive Staff.  During the call, Sullivan asked Bolton about his observations of

plaintiff at the liquor store.

Defendant also employed a private investigation service to determine whether plaintiff

had been working at Black's Liquor Store.[4]  The investigator verified that plaintiff had been

employed by Black's Liquor Store, and notified defendant of this information.[5]  Plaintiff,

however, denies ever being employed at Black's Liquor Store.  Plaintiff contends that starting in

May or June 2003, he would go to Black's Liquor Store to watch how a privately owned

business was run because plaintiff had aspirations of owning his own business someday.

Plaintiff alleges that he had discussions with Bolton about plaintiff's interest in owning his own

business.

Another member of the Senior Executive Staff, Steven Offner, testified that during a

---

[3]Plaintiff controverts this fact by alleging that the investigation of plaintiff's employment at the liquor store was approved, conducted, and pursued at the local facility by Livingston and Bolton.  To support this statement of fact, plaintiff cites his affidavit.  But the Court rejects plaintiff's allegations because there is no evidence that plaintiff had personal knowledge of these facts.  *See* Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge . . . ."); *see also Argo v. Blue Cross & Blue Shield of Kansas*, 452 F.3d 1193, 1200 (10th Cir. 2006) ("Under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to.") (citations omitted).  In this case, plaintiff was not in a position to observe defendant's investigation or to learn whether defendant conducted this investigation locally or in conjunction with the corporate human resources department in Omaha.

[4]Plaintiff controverts this fact by arguing that the evidence cited by defendant is hearsay, not signed or authenticated, and not in compliance with the requirements of Fed. R. Civ. P. 56 or D. Kan. Rule 56.1(d).  However, there is additional evidence in the record to support this fact.  In a deposition, Steven Offner, a member of defendant's Senior Executive Staff, testified that an investigator had been hired to determine whether plaintiff was working at the liquor store.  (Doc. 57, Ex. B at 3, lines 16–18.)

[5]Plaintiff also controverts this fact by arguing that the evidence cited by defendant is hearsay, but there is evidence in the record to support this fact in Offner's deposition testimony.  (Doc. 57, Ex. B at 3, lines 16–18.)

weekly staff meeting, Sullivan presented the circumstances surrounding plaintiff's employment, his status of being on paid FMLA leave, and the information obtained by Bolton and the private investigator that plaintiff had been working at Black's Liquor Store. According to Offner, the Senior Executive Staff then made the decision to terminate plaintiff for violating defendant's leave of absence policy and the dual employment policy. Bolton received a call from Sullivan after the Senior Executive Staff made its decision, and Sullivan told Bolton to terminate plaintiff. On September 29, 2003, Bolton met with plaintiff and informed him of his termination based on defendant's discovery that plaintiff was working at Black's Liquor Store in violation of defendant's employment policies. Plaintiff was terminated while he was on FMLA leave.

Plaintiff contends that other employees violated defendant's policy against dual employment, but were not terminated. Quentin Daniels, an African-American male, held a part-time job at Circuit City, but the job was during off-duty time and did not involve his working hours with defendant. Corey Carlson, a Caucasian male, worked as a financial planner after hours. Robert Garcia, a Hispanic male, had a family-owned landscaping business before he started working for defendant, but Garcia was instructed that the landscaping business was not to interfere with his work for defendant. Garcia's company contracted to do the landscaping at the Edwardsville facility, but Garcia was ordered by Bolton that he could not directly work for the landscaping company. Dan LeGrand, a Caucasian male, owned acreage and raised five or six pigs that he would sell to his family or anyone who wanted them. Offner, a member of defendant's Senior Executive Staff, has no recollection of any other individual besides plaintiff ever being terminated by defendant for violating the dual employment policy or the "not working while on leave-of-absence policy."

Plaintiff alleges that over the course of his employment, defendant violated employment laws and regulations at its Edwardsville facility.  Plaintiff contends that employees, whose main duties required them to work inside the refrigerated storage units, were routinely prevented from clocking in prior to putting on their cold weather gear, and were required to clock out before they changed out of their cold weather gear.  Plaintiff alleges that Bolton ordered him to "lock out" the time clock so that workers could not clock in when they started working.  Plaintiff also contends that Bolton ordered him to force workers to clock out before they had the opportunity to change out of their cold weather gear.  Bolton, however, testified that employees are allowed to put on their cold weather gear at any time, and that employees routinely put on their cold weather gear after clocking in for work.  Bolton denies that defendant's policy required employees to put on their cold weather gear before clocking in and to take off their gear before clocking out.  Bolton testified that defendant's policy was that an employee could not clock in more than five minutes before the start of the shift, but that defendant's policy did not "deal with" employees putting on their cold weather gear.  Offner testified that defendant's policy on employees changing into their cold weather gear "follow[s] the law in that particular fashion."

Cosgrove was Operations Manager at the Edwardsville facility during the times relevant to this action, and had supervisory responsibilities over plaintiff.  Cosgrove testified that employees in defendant's Edwardsville facility "were supposed to clock in when they're already to go to work, already with their gear on to go to work."  He also testified that employees were to clock out after the work was finished, before they had changed out of their cold weather gear.

Plaintiff contends that he informed Bolton that preventing workers from clocking in before changing into their cold weather gear and then forcing them to clock out before changing

out of their gear was a violation of wage and hours laws.  Plaintiff also alleges that defendant routinely required employees to clock out when there was no work for them, sometimes for as long as two-and-a-half to three hours, but would require the employees to stay on the premises until there was additional work for them.

Plaintiff also alleges that Bolton ordered him to terminate the employment of injured workers, including James Bishop and James A. Murray, because these workers had suffered accidents at work.  But Bolton testified that he never instructed plaintiff to terminate an employee for the sole reason that he suffered an injury at work.  Plaintiff also maintains that defendant would routinely suspend and harass workers who sustained on-the-job injuries, even if the cause of the accident was not their fault.  Plaintiff names seventeen employees that he contends were terminated because they suffered injuries at work.  However, Cosgrove testified that defendant does not terminate employees for suffering injuries.

Plaintiff maintains that on a number of other occasions he complained to Bolton that it was not proper for defendant to suspend or retaliate against injured workers merely because they had been injured on the job.  Bolton denies that plaintiff made such complaints.  Bolton was also asked in his deposition whether he ever told plaintiff that every time that an employee is hurt on the job, it costs defendant about five thousand dollars and those injured workers needed to be terminated.  Bolton denies making this statement, but admitted telling plaintiff that it costs defendant about five thousand dollars whenever an employee is injured and that was the reason that they needed to keep accidents down at the facility.  Cosgrove testified that in a meeting with several supervisors, Bolton reminded them that every employee work accident was a five thousand dollar penalty for the facility, and Cosgrove understood the purpose of that remark was

to heighten awareness because they did not want any employees injured in work accidents.

While not relevant to plaintiff's claims for retaliation and interference under the FMLA and whistleblowing under state law, plaintiff alleges that over the course of his employment with defendant, he suffered racial and sexual harassment.[6]  Plaintiff contends that after he became the Lead Supervisor, workers at defendant's facility started to despise him.  Plaintiff alleges that he found graffiti on the walls at work calling plaintiff names and depicting plaintiff being raped and hanged.  Plaintiff testified that he complained about the graffiti to Bolton, but Bolton denied ever receiving any complaints. Plaintiff contends that starting in about February 2003, Bolton began treating plaintiff in an unprofessional manner by raising his voice and shouting at plaintiff in front of coworkers and that he never saw Bolton scream or raise his voice at any of the Caucasian supervisors.

Plaintiff also complains of three incidents involving coworkers: Calvin Wiggins, a white male employee, allegedly harassed plaintiff and threatened to kill plaintiff; Chuck Lewis, a supervisor at defendant's company, allegedly remarked to plaintiff that it looked like he was having a Black Panthers meeting; and Dan LeGrand allegedly said the word "nigger," in reference to plaintiff.  Plaintiff contends that he submitted an employee grievance to Livingston in which he complained of LeGrand receiving a promotion despite using the word, "nigger," in reference to plaintiff.  Plaintiff states that he also attached photos of the graffiti to the grievance. Livingston denies receiving this grievance, and she testified that she does not recall receiving any racial or sexual grievances while working in human resources at the Edwardsville facility.

---

[6]For purposes of this motion, the Court considers plaintiff's allegations of racial and sexual harassment because such allegations are based on his personal knowledge.  *See* Fed. R. Civ. P. 56(e).  The Court, however, in no way makes any findings of fact relevant to plaintiff's additional claims that remain pending in this action.

Plaintiff states that although the grievance was handed to Livingston, it was addressed to Stinson who worked for corporate human resources in Omaha.

Around the same time, plaintiff asked Livingston to set up a meeting with Sullivan and Ed Uhaus, both with defendant's corporate human resources department in Omaha.  In early to mid-August 2003, Uhaus met with plaintiff at the human resources department in Edwardsville for the purpose of discussing plaintiff's grievance.  During the meeting, Uhaus and plaintiff discussed plaintiff's allegations of the unfair and disparate treatment that plaintiff had been receiving from Bolton, the problems that the facility was having with racially and sexually offensive graffiti, and the failure of defendant to discipline Dan LeGrand for using the word, "nigger," in reference to plaintiff.  The meeting lasted about one hour.  Plaintiff contends that as far as he knows, the only reason Uhaus came to Edwardsville was to deal with plaintiff's grievance.  At the conclusion of this meeting, Uhaus advised plaintiff that he would speak to Bolton about the concerns that plaintiff had expressed.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[7]  A fact is only material under this standard if a dispute over it would effect the outcome of the suit.[8]  An issue is only genuine if it "is such that a reasonable jury could return a verdict

---

[7]Fed. R. Civ. P. 56(c).

[8]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

for the nonmoving party."[9]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[10]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[11]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[12]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[13]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[14]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[15]

## III.   Discussion

### A.   FMLA Claims

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: "[including] [b]ecause of a

---

[9]*Id.*

[10]*Id.* at 251–52.

[11]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[12]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[13]*Id.*

[14]*Id.*

[15]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

serious health condition that makes the employee unable to perform the functions of the position of such employee."[16]  Plaintiff brings FMLA claims under two theories: (1) interference under § 2615(a)(1), and (2) retaliation under § 2615(a)(2).  The Court discusses each in turn.

### 1.    Retaliation

When analyzing FMLA retaliation claims under 29 U.S.C. § 2615(a)(2), courts apply the *McDonnell Douglas*[17] burden shifting approach.[18]  Under that approach, a plaintiff's establishment of a *prima facie* case creates a presumption of retaliation.  The burden then shifts to the defendant to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason.[19]  If the defendant meets this burden, the burden then shifts back to the plaintiff to present evidence that the proffered reason was not the true reason for the employment decision.[20]

In order to establish a *prima facie* case of FMLA retaliation, plaintiff must demonstrate that "(1) he engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action."[21]  Defendant does not challenge plaintiff's *prima facie* case of retaliation, and therefore the Court will assume that plaintiff has met his initial burden under the *McDonnell Douglas* approach.

---

[16]29 U.S.C. § 2612(a)(1)(D).

[17]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

[18]*See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

[19]*See id*.

[20]*Id*.

[21]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).

The burden then shifts to defendant to demonstrate a legitimate, nondiscriminatory reason for the termination decision.[22]  In this case, defendant maintains that it terminated defendant for violating its leave of absence policy and its dual employment policy.  This is a legitimate, nondiscriminatory reason for terminating plaintiff's employment.

Because defendant has established a legitimate, nondiscriminatory reason for plaintiff's termination, the burden shifts back to plaintiff to show that there is a genuine dispute of material fact as to whether defendant's reasons for plaintiff's termination are pretextual.[23]  A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[24]  "'[M]ere conjecture that [the] employer's explanation is pretext . . . is an insufficient basis for denial of summary judgment.'"[25]

As evidence of pretext, plaintiff argues that defendant has not shown that plaintiff was fired for violation of its policies and that defendant's policies were selectively and arbitrarily enforced.  The Court rejects plaintiff's contention that defendant has not shown that plaintiff was fired for violation of its policies.  In this case, the uncontroverted evidence shows that the Senior

---

[22]*Id.* at 1172 (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003)).

[23]*Id.* (citing *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006); *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1104 (10th Cir. 2005)).

[24]*Morgan*, 108 F.3d at 1323 (quotations omitted).

[25]*Id.* (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

Executive Staff were the decisionmakers who terminated plaintiff.[26]  While plaintiff contends

that the decision was made locally in the Edwardsville plant, the evidence offered to support this

fact is based only on plaintiff's speculation and is not based on his personal knowledge.  Plaintiff

appears to argue that the Senior Executive Staff gave "rubber stamp" approval of termination

decisions made at the local level when he contends that not once during his employment was a

termination decision by the supervisors at the Edwardsville facility ever reversed by the Senior

Executive Staff.  While not in the context of an FMLA claim, the Tenth Circuit has held that a

plaintiff can show pretext to support a Title VII claim when "a decisionmaker gives perfunctory

approval for an adverse employment action explicitly recommended by a biased subordinate."[27]

For a plaintiff to prevail on such a claim, he must show that a biased subordinate's

discriminatory reports, recommendation, or other actions caused the adverse employment

action.[28]

       In this case, the evidence shows that the Senior Executive Staff made the decision to

terminate plaintiff, and that decision was not merely a "rubber stamp" of a local decision based

on pretextual reasons.  Rather, the evidence in the record shows that defendant conducted an

investigation of plaintiff's alleged policy violations.  After Bolton saw plaintiff at Black's Liquor

Store, he called the corporate human resources department, located in Omaha, and informed

Mark Stinson that he had seen plaintiff working at the liquor store while plaintiff was on FMLA

---

[26]*Kendrick v. Penske Transp. Serv.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (stating that the Court must "look at the facts as they appear to the person making the decision to terminate the plaintiff").

[27]*E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004)).

[28]*Id.* at 487.

leave.  Afterwards, Bolton received a call from Sullivan, the Senior Vice President of Human

Resources and a member of the Senior Executive Staff.  Sullivan asked Bolton about his

observations of plaintiff at the liquor store.  Defendant also employed a private investigation

service that verified to defendant that plaintiff had been employed by Black's Liquor Store.[29]

After this information was gathered, Sullivan presented the findings to the Senior Executive

Staff during a weekly staff meeting.  Based on Sullivan's presentation of the investigation into

plaintiff's employment at the liquor store, the Senior Executive Staff made the decision to

terminate plaintiff for violating defendant's leave of absence policy and the dual employment

policy.

    While plaintiff contends that he was never an employee of Black's Liquor Store, the

Court must "look at the facts as they appear to the person making the decision to terminate the

plaintiff."[30]  In this case, the decisionmakers, the Senior Executive Staff, learned from a

company investigation that plaintiff was employed by Black's Liquor Store while on FMLA

leave.[31]  Based on these facts, the Senior Executive Staff determined that plaintiff was in

violation of two of defendant's employment policies.  First, the leave of absence policy states

that an employee who accepts other employment while on a leave of absence is subject to

---

[29]*See id.* at 488 ("[A]n employer can avoid liability by conducting an independent investigation of the allegations against an employee.").

[30]*Kendrick*, 220 F.3d at 1231.

[31]Plaintiff also argues, without reference to authority, that the timing of defendant's discovery of plaintiff's alleged employment at the liquor store demonstrates pretext.  Plaintiff contends that because this discovery occurred during plaintiff's FMLA leave, it calls into question the plausibility of defendant's preferred reason when plaintiff had been spending time at the liquor store starting in May or June 2003.  Close temporal proximity between protected activity and an action that a reasonable employee would have found materially adverse is only a factor in establishing pretext, and plaintiff "must therefore present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive."  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (citing *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206–07 (10th Cir. 2000)) (emphasis added).  The timing of plaintiff's termination—standing alone—does not demonstrate pretext.

automatic termination.  While plaintiff argues that defendant's FMLA policy is silent regarding

accepting other employment while on FMLA leave, this does not affect the language of the leave

of absence policy.  The facts as they appeared to the decisionmakers—that plaintiff was on leave

and that he had accepted other employment—demonstrated that plaintiff was in violation of the

leave of absence policy, regardless of whether the FMLA policy spoke to this issue.[32]  Second,

defendant's dual employment policy prohibits salaried employees from accepting regular

employment with any other organization.  Based on the facts as they appeared to the Senior

Executive Staff, plaintiff was in violation of both of these policies, and therefore plaintiff was

terminated.

Plaintiff also argues that pretext is established by evidence that defendant arbitrarily and

selectively enforced these policies.  The Tenth Circuit has held that "a plaintiff may show pretext

by 'providing evidence that he was treated differently from other similarly-situated employees

who violated work rules of comparable seriousness.'"[33]  Plaintiff points to evidence that

defendant did not enforce its policy prohibiting dual employment against four other supervisors.

Plaintiff contends that Robert Garcia, a Hispanic male, violated the dual employment policy with

his interest in a family-owned landscaping business, but there is no evidence that he worked for

this company upon his employment with defendant.  In fact, he was ordered by Bolton to not

---

[32]Plaintiff also contends that the leave of absence policy did not apply to plaintiff's situation because he was not granted leave to accept other employment.  In the second paragraph of the leave of absence policy, the first sentence states that "[u]nder no circumstance should you be granted a leave of absence to accept other employment." It is true that there is no evidence that plaintiff was granted FMLA leave to accept other employment.  But the leave of absence policy goes on to state that "[i]f while on a leave of absence you accept other employment, such acceptance will result in automatic termination."  In this case, the facts as they appeared to the decisionmakers were that plaintiff was employed by the liquor store while he was on FMLA leave.  Based on these facts, defendant was in violation of the policy by accepting other employment while on leave.

[33]*Metzler*, 464 F.3d at 1175 (quoting *Kendrick*, 220 F.3d at 1230).

directly work for the landscaping company.  Also, plaintiff argues that Dan LeGrand, a Caucasian male, raised five or six pigs that he would sell, but there is no evidence this activity constituted "regular employment" that is prohibited under the dual employment policy.  There is evidence in the record that either Cosgrove or Bolton knew that Quentin Daniels, an African-American male, held a part-time job at Circuit City, and that Corey Carlson, a Caucasian male, worked as a financial planner after hours.  However, even assuming that defendant selectively enforced the dual employment policy, plaintiff was also terminated for violating the leave of absence policy.  Plaintiff argues that pretext is shown by the fact that no other individual besides plaintiff has ever been terminated for violating the leave of absence policy, but there is no evidence of any similarly situated employee accepting employment while on a leave of absence in violation of that policy.  Thus, there is no evidence that defendant arbitrarily or selectively enforced the leave of absence policy.  Accordingly, plaintiff cannot establish pretext based on this allegation.

Plaintiff further contends that defendant arbitrarily enforced its employment policies with Calvin Wiggins, a white male employee, who allegedly harassed plaintiff and threatened to kill plaintiff, an act that would be in violation of defendant's employment policies.[34]  Plaintiff argues that there was no investigation into this alleged threat, no discipline was ever issued, and that Wiggins was not terminated for his statement.  However, the record does not support these statements.  The only evidence cited by plaintiff regarding Wiggins' alleged threat appears in Bolton's deposition testimony.  Bolton was shown an employee grievance, filed by Wiggins.  In

---

[34]The Court will assume that the employment policy prohibiting Wiggins' alleged statements is a "rule of comparable seriousness" to the dual employment and leave of absence policies.  *See Metzler*, 464 F.3d at 1175 (quoting *Kendrick*, 220 F.3d at 1230) (providing evidence that plaintiff was treated differently from other similarly-situated employees who violated "work rules of comparable seriousness" may show pretext).

that grievance, another employee told the investigator that Wiggins had said that he would like to harm plaintiff and had stated that he would like to kill plaintiff.  Bolton testified that he had knowledge of this grievance but that he was not involved in the investigation.  Bolton also testified that he did not recall being informed of Wiggins' alleged threats to plaintiff but that he knew that Wiggins did not like plaintiff.  Bolton further testified that he thought that human resources had conducted an investigation into this alleged threat because the grievance indicated that the corporate human resources department was involved.  When asked whether Wiggins received any discipline for making this alleged threat, Bolton testified that he did not have specific knowledge regarding the incident.  Therefore, the evidence in the record does not support plaintiff's arguments that defendant did not investigate or discipline Wiggins for the alleged threat, rather Bolton testified that it appeared that defendant had conducted an investigation into the matter and he did not know whether Wiggins had been disciplined because he did not have specific knowledge of the incident.  Therefore, based on the evidence in the record, plaintiff has not shown that defendant selectively enforced its employment policies regarding its handling of Wiggins' alleged threat.

Plaintiff argues in one sentence of his response that "evidence of pretext regarding his termination in reference to his FMLA retaliation claim . . . is also relevant and material to his Title VII and other civil rights claims."[35]  To the extent that plaintiff argues in this one sentence that plaintiff's allegations of racial or sexual harassment support his claim for FMLA retaliation, the Court disagrees.  A pattern of retaliatory actions taken by a defendant against a plaintiff who

---

[35](Doc. 62 at 26.)

18

has engaged in protected activity can preclude summary judgment.[36]  However, there is no evidence in this case that the alleged racial or sexual harassment gives rise to an inference of a retaliatory motive based on defendant's FMLA leave.  In fact, all of the racial or sexual harassment that plaintiff alleges occurred before he requested and was granted FMLA leave. Further, even assuming that plaintiff's allegations are true, such evidence does not show that defendant's proffered reason for terminating plaintiff is pretextual.[37]  Plaintiff alleges several incidents of racial harassment, but in his response, he fails to show how these allegations demonstrate that defendant's reason for terminating plaintiff is inconsistent or implausible.

Based on the evidence in the record, plaintiff has not shown any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in defendant's proffered reason for plaintiff's termination—his violation of defendant's employment policies.  Therefore, because plaintiff cannot show pretext, summary judgment is granted in favor of defendant on plaintiff's FMLA retaliation claim.

## 2.   Interference

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."[38]  Under the interference theory, if an employer interferes with an employee's FMLA-created right to a medical leave, it has violated the FMLA, regardless of its intent.[39]  In such a case, the employee must demonstrate

---

[36]*Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

[37]The Court emphasizes that it is not making any findings of fact as to plaintiff's allegations of racial and sexual harassment which are relevant to other pending claims in this action.

[38]26 U.S.C. § 2615(a)(1).

[39]*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).

his entitlement to the disputed leave.[40]  The intent of the employer is immaterial.[41]

To establish a claim under an interference theory, a plaintiff must show: "'(1) that he [or she] was entitled to FMLA leave; (2) that some adverse action by the employer interfered with his [or her] right to take FMLA leave; and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights.'"[42]  Nonetheless, even when an employee requests and can demonstrate an entitlement to FMLA leave, he has no greater rights than the employee who continues to report to work.[43]  Thus, an employee may be terminated, even where the termination interferes with his ability to take FMLA leave, so long as he would have been terminated regardless of his leave request.[44]

In this case, because defendant does not dispute that plaintiff was entitled to FMLA leave, the Court will assume that plaintiff has met the first requirement to establish an interference claim.  Under the second requirement, plaintiff alleges that the following adverse actions interfered with his right to take FMLA leave: (1) Bolton questioned plaintiff's need for FMLA leave and suggested that his request for FMLA leave was fraudulent; (2) defendant demanded that plaintiff complete the paperwork before granting him FMLA leave and refused to provide the required forms when requested by plaintiff; (3) defendant demanded that plaintiff attend a face-to-face meeting before receiving his FMLA paperwork; (4) defendant made

---

[40]*Id.*

[41]*Id.*

[42]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005)).

[43]*See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998).

[44]*See id.*

inappropriate and intrusive inquiries regarding plaintiff's family life; and (5) defendant threatened to terminate plaintiff for not submitting a certificate from his doctor after not timely providing him with the paperwork he needed to do so.  Defendant argues, however, that plaintiff cannot bring a claim for interference when none of these actions interfered with plaintiff's right to take FMLA leave.  In this case, defendant contends that there was no denial of plaintiff's substantive rights under the FMLA because plaintiff was granted FMLA leave retroactively to August 27, 2003, the first day plaintiff asked defendant for such leave.

The FMLA does not define "interference," but Department of Labor regulations provide that interference with the exercise of an employee's rights includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.[45]  If an employer provides a powerful disincentive for taking FMLA leave, it constitutes interference.[46]  In this case, none of plaintiff's allegations rise to the level of a "powerful disincentive" for taking FMLA leave in contrast to actions that have been prohibited by other courts.[47]  Plaintiff testified that no one ever told him that he could not take FMLA leave.  Further, plaintiff was in fact granted FMLA leave dating retroactively to the date that plaintiff first requested leave from defendant.

In *McKinzie v. Sprint/United Management Co.*,[48] the court found that defendant had not

---

[45] 29 C.F.R. § 825.220(b).

[46] *Mardis v. Cent. Nat'l Bank & Trust of Enid*, 173 F.3d 864, 1999 WL 218903, at *2 (10th Cir. Apr. 15, 1999).

[47] *See, e.g.*, *id.* at *2 (finding interference when an employer informed an employee that she would be irrevocably deprived of all accrued sick leave and annual leave as a condition of taking FMLA leave); *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1203 (D. Kan. 2006) (holding that employer's oral denial of plaintiff's request for FMLA leave showed interference); *Goodwin-Haulmark v. Menninger Clinic, Inc.*, 76 F. Supp. 2d 1235, 1242 (D. Kan. 1999) (holding that defendant interfered with plaintiff's right when the employer forced her to choose between resignation and working without leave).

[48] No. 03-2348-GTV, 2004 WL 2634444, at *10 (D. Kan. Nov. 16, 2004).

interfered with plaintiff's FMLA rights when she was granted leave whenever she requested it.[49] Plaintiff argued that interference was shown by her supervisors' sarcastic and derogatory comments about her need for leave, the requirement that plaintiff have her FMLA recertified, the requirement that plaintiff keep track of her work time after taking leave, and her supervisors' criticism of her work performance.[50]  The court rejected plaintiff's contention that these allegations showed interference when plaintiff was allowed to take FMLA leave, and there was nothing in the record showing that plaintiff was discouraged from taking FMLA leave, or that defendant's conduct created any kind of chilling effect.[51]

Similarly, in this case, plaintiff alleges interference is shown by Bolton's questioning his need for leave and making inappropriate comments about plaintiff's family life and by defendant's requirement that plaintiff pick up the FMLA paperwork at the work facility and that plaintiff submit the appropriate paperwork or face termination.  None of these allegations, viewed in the light most favorable to plaintiff, show that plaintiff was discouraged from taking leave.  Upon plaintiff's receipt of the FMLA paperwork, he filled out the forms and provided the information to defendant.  Defendant then granted plaintiff FMLA leave, beginning on August 27, 2003, when plaintiff first requested leave.  These allegations, alone, do not support plaintiff's claim for FMLA interference.

However, plaintiff also argues that defendant's termination of plaintiff interfered with his right to take FMLA leave.  Plaintiff's termination is an adverse action by defendant sufficient to meet the second requirement to establish an interference claim.  Therefore, plaintiff must show

[49]*Id.*

[50]*Id.*

[51]*Id.*

22

that there was a casual connection between his termination and his exercise of FMLA rights.

"A reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory."[52]  Also, "an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request."[53]  In this case, Offner specifically testified that plaintiff was fired for violating two employment policies. The facts, as they appeared to the decisionmakers, showed that plaintiff had violated two employment policies by working at Black's Liquor Store while on leave, and therefore defendant terminated plaintiff's employment.  Defendant has shown its reasons for terminating plaintiff were unrelated to his exercise of FMLA rights, and when viewing the evidence in the light most favorable to plaintiff, there is nothing in the record to the contrary.  Therefore, plaintiff's claim for interference fails, and summary judgment is granted as to this claim as well.

**B.     Whistleblower Claim**

Plaintiff claims that he was wrongfully discharged in retaliation for complaining about alleged violations of employment laws and regulations at defendant's Edwardsville facility.  The Kansas Supreme Court has recognized retaliatory discharge for whistleblowing as an actionable tort.[54]  A whistleblowing retaliatory discharge action is a public policy exception to the

---

[52]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004) (citing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 298, 961 (10th Cir. 2002); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998)).

[53]*Gunnell*, 152 F.3d at 1262.

[54]*Ortega v. IBP, Inc.*, 874 P.2d 1188, 1192 (Kan. 1994).

employment-at-will doctrine.[55]  Kansas courts have adopted the *McDonnell Douglas*[56] burden-shifting approach for analyzing retaliatory discharges claims.[57]  Plaintiff must first establish a *prima facie* case of retaliation.  "To establish a *prima facie* case for whistleblowing, plaintiff has the burden of proving: (1) a reasonably prudent person would have concluded [defendant] was engaged in activities in violation of the rules, regulations, or law pertaining to public health, safety, and general welfare; (2) [defendant] had knowledge of plaintiff's reporting of such violation prior to discharging him; and (3) he was discharged in retaliation for making the report."[58]  In this case, defendant assumes for the purposes of its summary judgment motion that plaintiff can establish a *prima facie* case.

"Once the employee establishes a *prima facie* case, the defendant must come forward with legitimate, nonretaliatory reasons for its actions."[59]  "If the employer meets this burden, the burden then shifts back to the plaintiff, and, to avoid summary judgment, the plaintiff 'must assert specific facts establishing a triable issue as to whether the employer's reasons for discharge is a mere cover-up or pretext for retaliatory discharge.'"[60]  "Plaintiff must prove his claim 'by a preponderance of the evidence, but the evidence must be clear and convincing in

---

[55]*Id.* at 1194.

[56]411 U.S. 792 (1973).

[57]*Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002) (citing *Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n*, 35 P.3d 892, 898 (Kan. 2001)).

[58]*Glover v. NMC Homecare, Inc.*, 106 F. Supp. 2d 1151, 1169 (D. Kan. 2000) (citing *Palmer v. Brown*, 752 P.2d 685, 690 (Kan. 1988)).

[59]*Conrad v. Bd. of Johnson County Comm'rs*, 237 F. Supp. 2d 1204, 1266 (D. Kan. 2002) (citing *Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002)).

[60]*Id.* (quoting *Foster*, 293 F.3d at 1193).

nature.'"[61]

For the same reasons discussed above in reference to plaintiff's FMLA retaliation claim, plaintiff fails to support his claim for whistleblowing retaliatory discharge.  Defendant has brought forth legitimate, nonretaliatory reasons for plaintiff's termination—the decisionmakers terminated plaintiff's employment with knowledge that plaintiff had violated two employment policies.  To establish pretext, plaintiff relies on the same arguments that he asserted for his FMLA retaliation claim.  As explained above, none of plaintiff's allegations demonstrate any weaknesses or implausibilites in defendant's proffered reasons for its termination of plaintiff such that a reasonable factfinder could rationally find them unworthy of credence.

In the statement of facts section of plaintiff's response, plaintiff puts forth allegations that he observed and complained about violations of employment laws while he was employed by defendant.  For instance, plaintiff contends that he complained to Bolton that requiring employees to change into or out of their cold weather gear while not on the clock was a violation of wage and hours laws.  Plaintiff also alleges that Bolton ordered plaintiff to fire workers who had sustained on-the-job injuries and that plaintiff complained to Bolton that retaliating against these injured workers was not proper.  But in the argument section of his response, plaintiff does not assert that plaintiff's complaints show pretext.  Even if plaintiff made such an argument, plaintiff's allegations of employment law violations do not establish that defendant's proffered reason was pretextual.  "Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment."[62]  Plaintiff's

---

[61]*Glover*, 106 F. Supp. 2d at 1169 (quoting *Ortega v. IBP, Inc.*, 874 P.2d 1188, 1189 (Kan. 1994)).

[62]*Morgan v. Hilti*, 108 F.3d 1619, 1324 (10th Cir. 1997) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994)).

complaints about alleged employment law violations do not cast doubt on defendant's nondiscriminatory reason for terminating plaintiff.  Thus, summary judgment is also granted as to plaintiff's claim for whistleblowing.

**IV.     Conclusion**

For all the reasons stated above, the Court grants summary judgment in favor of defendant as to plaintiff's claims retaliation and interference under the FMLA and whistleblowing under Kansas state law.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Partial Summary Judgment (Doc. 56) is **GRANTED.**

**IT IS SO ORDERED**.

Dated this 22nd day of February 2007.

S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

26